**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____ :　　Civil Action No. 16-8619 (FLW)(LHG)
ROBERT H. STANLEY,　　　　　　　 :
　　　　　　　　　　　　　　　　 :　　　　　**OPINION**
　　　　　　　　　　　Plaintiff,　 :
　　　　　　　　　　　　　　　　 :
　　　v.　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　 :
COMMISSIONER OF SOCIAL　　　　　 :
SECURITY,　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　Defendant.　 :
_____ :

**WOLFSON, United States District Judge**:

　　　　Before the Court is the Complaint of Robert H. Stanley ("Plaintiff") seeking review, pursuant to 42 U.S.C. § 405(g) & § 1383(c)(3), of the determination of Defendant, the Commissioner of Social Security ("Commissioner"), denying Plaintiff's application for Disability Benefits under Title II and Title XVI of the Social Security Act on the grounds that Plaintiff is not disabled because he retains the mental and physical residual functional capacity ("RFC") to perform other work available in the economy. Plaintiff contends that the Commissioner's decision is not supported by substantial evidence and asks the Court to reverse the Commissioner's disability finding and enter an award of benefits, or, in the alternative, to remand Plaintiff's case for rehearing. For the reasons set forth below, the Court finds that although the Commissioner's physical RFC determination is supported by substantial evidence in the record, the decision of the administrative law judge concerning Plaintiff's mental RFC does not comport with the standard set forth by the Third Circuit in *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981) and its progeny and therefore is not susceptible to meaningful review by this Court on the present record. The decision of the Commissioner on Plaintiff's physical RFC is

therefore affirmed, and Plaintiff's case is remanded to the Social Security Administration for reconsideration of the pertinent medical evidence and explanation of the reasoning employed in evaluating such evidence to determine Plaintiff's mental RFC.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Plaintiff was born on June 4, 1959, and was 50 years old on his alleged disability onset date of November 30, 2009. Plaintiff is a college graduate, with a B.A. in economics. His past relevant work was for financial institutions as a stock trader. Administrative Transcript ("Tr."), 53, 191. On May 31, 2012, Plaintiff applied for disability insurance benefits, alleging disability, beginning on November 30, 2009, due to bipolar disorder, arthritis of the toes, hips, and ankles, and hip replacement. *Id.* at 63. The application was denied initially, Tr. 62, 95-99, and on reconsideration, *id.* at 75, 101-106. Plaintiff requested a hearing before an administrative law judge to review the application *de novo*. *Id.* at 107-108. A hearing was held on March 24, 2015, before Administrative Law Judge John Giannopoulos (the "ALJ"), at which Plaintiff, represented by counsel, and an impartial vocational expert, testified. *Id.* at 27-61.

On May 28, 2015, the ALJ issued a decision finding Plaintiff not disabled at step five of the sequential evaluation because Plaintiff could perform other work. *Id.* at 12-22. Plaintiff sought review of the ALJ's decision before the Appeals Council, Tr. 7-8, 243-244, and, on September 19, 2016, the Appeals Council concluded that there were no grounds for review, *id.* at 1-6. When the Appeals Council denied Plaintiff's request for review, the ALJ's decision became the Commissioner's final decision. *Id.* at 1-3; *See* 20 C.F.R. § 404.981.

Plaintiff filed a Complaint on November 18, 2016, seeking appellate review of the Commissioner's decision as not supported — and directly contradicted — by substantial evidence in the administrative record. Plaintiff filed his brief in support of his appeal on April 3,

2017, and the Commissioner responded in opposition on May 18, 2017. Plaintiff did not file a reply. On appeal, Plaintiff contends that the Commissioner erred in finding that Plaintiff possessed the physical and mental residual functional capacity to perform other work in the economy. In considering Plaintiff's appeal, the Court is therefore called upon to review the evidence in the administrative record underlying the ALJ's RFC determination.

A. Function Report

On September 10, 2012, Plaintiff submitted a Function Report setting forth his self-reported levels of activity since the onset of his claimed disability. Plaintiff indicated that he performed simple household chores, including dusting, wiping counters, sometimes folding laundry, and unloading the dishwasher. Tr. 198-200. Plaintiff reported that he independently handled his own personal care, but that it took "twice as long" as it had in the past to perform activities like dressing, bathing, shaving, and eating. *Id.* at 199. Plaintiff also stated that he did not need reminders for self-care, grooming, or taking medicine, that he prepared his own meals daily, and that he went outside each day, checked his electronic mail, watched television, walked, drove, went out alone, went grocery shopping once a week for 30-45 minutes, shopped by mail and computer, and used notes and an electronic calendar to remind him where to go. *Id.* at 198-202. Plaintiff reported that he was less social and more withdrawn than he had been in the past, but continued to eat dinner and watch television with his wife and to exchange e-mail with his adult children and friends on a daily basis. *Id.* at 198, 202.

Plaintiff indicated that he could walk for half a mile before needing to rest, could pay attention for 15 minutes, finish what he started "most of the time," and follow spoken instructions without multiple steps. *Id.* at 203. Plaintiff reported that, generally, he got along well with authority figures, had never been fired from a job because of problems getting along

with others, and handled changes in routine "okay." *Id.* at 205. Plaintiff stated that he had memory problems, difficulty with simple mathematics and concentration, and experienced sleepiness. *Id.* at 41, 217.

B. Work History Report

On September 13, 2012, Plaintiff submitted a Work History Report, in which he stated that, after the alleged onset date of November 30, 2009, he worked for a securities firm, providing investment banking services, from February to June 2010. Tr. 206. Plaintiff reported working six to eight hours per day, five to six days per week, using technical knowledge or skills, writing and completing reports, and using the phone and computer. *Id.* at 206-07. Plaintiff also reported continuing on with the same securities firm, working from home on commission for the period from June 2010 to April 2011. *Id.* at 207. Plaintiff characterized this arrangement as unsuccessful, reporting only approximately $7,000 in income for the period. *Id.* Plaintiff's work history records are somewhat unclear on the date at which Plaintiff ceased all work activity, as, in an undated Disability Report from approximately August of 2012, Plaintiff reported that he stopped work on November 1, 2010. *Id.* at 190.

C. Review of the Objective Medical Evidence

1. Evidence of Physical Impairments

The objective medical evidence in the record relevant to Plaintiff's physical impairments consists primarily of the reports and notes of Plaintiff's treating physician, Dr. Peter T. Orlic, M.D.; the report of the consultative examination of Dr. Justin Fernando, M.D.; and certain references in the treatment notes of Plaintiff's psychologists and psychiatrists, recording Plaintiff's self-reported physical activities during the period of his claimed disability. The Court discusses the physical medical evidence at length in its analysis below, and so will not reproduce

it again in detail here. It suffices to note that Plaintiff's treating physician, Dr. Orlic, opined that Plaintiff had no physical limitations of any kind, be they on lifting, carrying, standing, walking, sitting, pushing, or pulling, but did have mental health conditions, including rapid cycling bipolar disorder, which limited his ability to do work-related activities. Tr. 246, 250. Dr. Fernando opined that Plaintiff displayed no physical limitations as a result of his 2001 hip replacement or claimed arthritis of the big toes of his feet, and observed that other than potentially mild arthritis of the toes, "the examination could be considered, very close to a normal exam." *Id.* at 289. Finally, the treatment notes attached to the psychiatric report of Plaintiff's treating psychiatrist Dr. Emmanuel Hriso, M.D., indicate that Plaintiff traveled to Florida in November of 2010 to visit his parents for Thanksgiving, Tr. 278, and traveled to Denver in October of 2011 to visit his daughter, *id.* at 280.

2. Evidence of Mental Impairments

The medical evidence in the record concerning Plaintiff's mental impairments consists of the report and treatment notes of Plaintiff's treating psychiatrist, Dr. Hriso; the report and treatment notes of Plaintiff's treating psychologist, Dr. Donna Chavkin, Psy. D.; the consultative psychiatric examination report of Dr. Esha Khoshnu, M.D.; and the findings of the evaluative psychologists at the state Disability Determination Services ("DDS") office of the Social Security Administration.

a. Dr. Hriso

Dr. Hriso began treating Plaintiff in October 2005. Tr. 251. Dr. Hriso diagnosed Plaintiff with bipolar disorder and a history of alcohol dependence. *Ibid.* In December 2009, Dr. Hriso noted that Plaintiff was doing well, had an even mood, and was still doing consulting work in New York City. *Id.* at 274. In March 2010, Plaintiff's mood had been stable, and he was

working for commission. *Id.* at 275.  In May 2010, Plaintiff was doing well, in a stable mood, was moving to North Carolina, and his job was secure and going well. *Id.* at 275.  In August 2010, although Plaintiff "got a bit manic" for one and a half weeks while moving, he was very happy with the move to North Carolina. *Id.* at 276.  The next month, Plaintiff was charged in North Carolina with driving under the influence, Tr. 276, but in October 2010, he was doing better, attending alcohol treatment, and wearing an alcohol monitoring bracelet, *id.* at 277.  In November 2010, Plaintiff's mood was stable. *Id.* at 277.  In December 2010, Plaintiff broke down while telling Dr. Hriso that his sister had recently died of cancer, but also said that he had a good time with his wife in Florida visiting his parents for Thanksgiving. *Id.* at 278.  In January and February 2011, Plaintiff's mood was stable and he had no mania or depression. *Id.* at 278-79. In February 2011, he had a stable mood, no mania or depression, and he was considering relocating because his work was "falling off." *Id.* at 279.

In March and April 2011, Plaintiff reported that he was not feeling well and having palpitations. *Id.* at 279-80.  In October 2011, Plaintiff reported that he had an alcohol abuse relapse after a trip to Denver and was hospitalized for three days. *Id.* at 280. Plaintiff moved back to New Jersey, and, in April 2012, his mood became unstable; he was anxious and having panic attacks. *Id.* at 281.  After Dr. Hriso adjusted Plaintiff's medication, Plaintiff became better, but still felt frustrated and agitated. *Id.* at 281.  Later that month, Plaintiff reported feeling better, sleeping better, feeling less anxious, and being busy painting the house he and his wife were renting. *Id.* at 282.  In June 2012, Plaintiff was depressed and was planning to go with his son down to North Carolina for his DUI case. *Id.* at 283.  Dr. Hrsio noted that Plaintiff was much better in July 2012; Plaintiff's mood was fairly stable and he had no urge to drink alcohol. *Id.* at

284.  The following month, Plaintiff's mood remained stable, with occasional sadness, and he reported having a surprise party for his wife's birthday and that she was very happy. *Id.* at 284.

On August 27, 2012, Dr. Hriso completed a psychiatric report and checked the boxes indicating that Plaintiff had limited abilities in understanding, memory, sustained concentration and persistence, social interaction, and adaptation. *Id.* at 254.  Dr. Hriso only elaborated under the sustained concentration and pace heading by writing that Plaintiff had progressively more difficulty functioning in a normal work-like environment. *Id.* at 254.  Dr. Hriso opined that Plaintiff was capable of managing his own benefits. *Id.* at 255.

On May 31, 2013, Dr. Hriso completed a mental disorder questionnaire and noted that Plaintiff was living with his second wife, who was very supportive. *Id.* at 315.  Although Plaintiff's medication caused a psychomotor and cognitive slowdown, Plaintiff had adapted and was not as tired and fatigued as he was in the beginning. *Id.* at 315.  The medications that stabilized Plaintiff's mood also caused improved communication with his wife, neighbors, friends, and son. *Id.* at 316.  Although Plaintiff took care of himself, drove, maintained his residence, and rode a bike, Dr. Hriso opined that Plaintiff's psychiatric condition rendered him unable to adjust to a work environment at that time. *Id.* at 316-17.

On August 5, 2014, Dr. Hriso opined that Plaintiff had a fair ability to relate to co-workers, deal with the public, use judgment, function independently, understand and carry out simple job instructions, maintain personal appearance, relate predictably in social situations, behave in an emotionally stable manner, and demonstrate reliability. *Id.* at 310, 313.  Dr. Hriso opined that although Plaintiff had poor to no ability to follow work rules, interact with supervisors, deal with work stress, or maintain attention and concentration, Plaintiff could manage benefits in his own best interest. *Id.* at 311-12.

b. Dr. Chavkin

Plaintiff began treatment with Dr. Chavkin in October 2005. In July 2013, she completed a mental disorder questionnaire form. Tr. 297. Dr. Chavkin wrote that Plaintiff's bipolar disorder had been stable since the fall of 2011. *Id.* at 300. Dr. Chavkin indicated that despite Plaintiff's long history of alcohol and drug dependence, he had not been hospitalized for drugs, alcohol, or rapid cycling bipolar disorder. *Id.* at 293. Plaintiff was responsible about attending his appointments, he had difficulty maintaining concentration and fluency with numbers, and he could no longer maintain his prior level of high intellectual functioning. *Id.* at 293-94. Plaintiff had a good attitude and was pleasant and cooperative. *Id.* at 294. Although Plaintiff's memory was poor, he could manage his own funds, care for himself, shop, cook, and perform simple household routines. *Id.* at 295-96, 299. On examination, Plaintiff recalled three words immediately and two words after five minutes; he was slow in recalling content from earlier in their session and events of the past week; he could track conversation and needed some refocusing. *Id.* at 299. Plaintiff was good in the area of daily activities, but had "severe memory limitations," and difficulty focusing and completing task. *Id.* at 301-02.

On August 3, 2014, Dr. Chavkin stated that Plaintiff was cooperative in all respects, he had short term memory and concentration problems, and low energy. *Id.* at 307. Dr. Chavkin opined that Plaintiff had a fair ability to follow work rules, relate to co-workers, maintain personal appearance, and relate predictably in social situations and poor to no ability to deal with public, use judgment, interact with supervisors, deal with work stress, function independently, maintain attention and concentration, understand and carry out simple job instructions, behave in an emotionally stable manner, and demonstrate reliability. *Id.* at 308-09.

c. Dr. Khoshnu

In September 2013, Dr. Khoshnu performed a consultative examination of Plaintiff. Tr. 305. Plaintiff denied any history of drug and alcohol use. *Id.* at 305. On examination, Plaintiff spelled "world" correctly forward and backward, performed poorly on serial 7s, recalled three words immediately and no words after two to three minutes, and correctly named the past four presidents. *Id.* at 306. Plaintiff was cooperative and reported caring for himself, watching television, and doing laundry. *Id.* at 305. Dr. Khoshnu's Axis I diagnosis was bipolar disorder, symptom maintenance secondary to chronic use of high dosage of Lexapro since 2009 and delayed treatment of bipolar disorder in 2005; bipolar disorder rapid cycling and mood worsening secondary to chronic use of Lexapro, rule out dependence on clonazepam and cognitive difficulty secondary to Seroquel. *Id.* at 306. His Axis IV diagnosis was "moderate-to-severe chronic mental illness and poor management of medication." *Ibid.*

    d.  DDS Agency Medical Experts

In October 2012 and August 2013, state agency psychologists reviewed Plaintiff's initial disability application and opined that Plaintiff could perform the basic mental demands of unskilled work. Tr. 66, 68, 85. Plaintiff could sustain focus and memory, handle basic social interaction, and maintain pace and persistence to perform simple, routine tasks. *Id.* at 72, 90. The agency psychologists also found Plaintiff to be limited in his social interactions, reporting moderate limitations in Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors and in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, as well as marked limitation in his ability to appropriately interact with the general public. *Id.* at 72.

    3.  Review of the Testimonial Record

At the hearing held on March 24, 2015, the ALJ heard testimony from the Plaintiff and from impartial vocational expert Edna F. Clark. Plaintiff testified that he had worked for approximately twenty-eight years as a stock trader before being terminated in 2007. Tr. 34-35. Under examination by the ALJ, Plaintiff explained that he had been terminated sometime after a workplace retaliation dispute involving a female coworker. *Id.* at 39. Plaintiff further stated that at the time and thereafter he had been "self-medicating" with alcohol, and while he may have had an alcohol problem in the past, he no longer had a desire to drink while on his medications. *Id.* at 40. Plaintiff testified that after his disability onset date, he had attempted to start a high frequency trading operation with a few partners sometime in 2011, but that it had been unsuccessful. *Id.* at 35-36.

When questioned about his social activities, Plaintiff explained that roughly twice per year he would attend Syracuse basketball games with his brother-in-law. *Id.* at 44. When questioned about his changes of residence after his termination in 2007, Plaintiff stated that he moved from New Jersey to Florida, back to New Jersey, from New Jersey to North Carolina, and from North Carolina to Virginia between 2007 and 2010. *Id.* at 49. Plaintiff later relocated to upstate New York, where he resided at the time of the hearing. Finally, the ALJ inquired into Plaintiff's physical limitations, and Plaintiff testified that he suffered from arthritis pain in the big toes of his feet, which limited his ability to walk and stand to between a half-hour and an hour. *Id.* at 51-52.

The vocational expert characterized Plaintiff's past work as either light exertional or sedentary, skilled work, and testified in response to the ALJ's hypotheticals that Plaintiff was no longer able to perform it. *Id.* at 53-54. The ALJ inquired in follow-up hypotheticals whether there were limitations that would enable a person in Plaintiff's position to perform his past work.

*Id.* at 54-55. The vocational expert testified that there were not. *Id.* at 55. The ALJ then inquired whether a person of Plaintiff's age and education could perform jobs at the medium exertional level involving only simple, routine, and repetitive tasks. *Id.* at 54. The vocational expert testified that a person of Plaintiff's description could perform such jobs and identified the medium exertional jobs of cleaner II, bagger, and hand packer present in the economy in significant numbers. *Id.* at 55. The ALJ then posed further hypotheticals concerning the ability of a person of Plaintiff's description to perform light work. *Id.* at 55.

In the exchange most relevant to the present appeal, the ALJ asked the vocational expert if, hypothetically, a person of Plaintiff's age and education in the medium exertion jobs the vocational expert had identified had to be away from work at least one day per week due to the side effects of medication or mental illness would be able to maintain such jobs. *Id.* at 55. The vocational expert testified that such a person could not. *Id.* at 56. In response to additional hypotheticals, the vocational expert went on to testify that such a person would be able to maintain certain of the identified jobs if he had to be off task an additional hour and 15 minutes every day, or 15% of the time. *Id.* at 56.

Under questioning from Plaintiff's counsel, the vocational expert testified that a person of Plaintiff's age and education would not be able to maintain the identified jobs if he were required to be absent two days per month. *Id.* at 56. Plaintiff's counsel then inquired about the acceptable limit of off-task time per day in "simple production oriented jobs." *Id.* at 57. The vocational expert opined that the acceptable rate was 5% to 7% off-task in such jobs and that, generally speaking, a person required to be more than 5% off-task would not be able to maintain employment at such production oriented jobs. *Id.* at 57. Plaintiff's counsel then inquired whether the jobs that the vocational expert had identified in the economy were production oriented. *Id.* at

57-58. The vocational expert testified that they were not because, while they required productivity, they did not involve a high rate of production. *Id.* at 58. Asked to clarify the meaning of "high rate of production," the vocational expert explained that at non-high-rate-of-production jobs a worker is called upon only to perform at a rate consistent with others, rather than to achieve fixed production quotas for units or tasks per hour. *Id.* at 58.

D. The ALJ's Findings

The ALJ performed the sequential evaluation process utilized in adjudicating disability claims, explained in the standard of review below.[1] At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 21, 2015, and had not engaged in substantial gainful activity since November 30, 2009, the alleged onset date. Tr.

---

[1] The Commissioner utilizes a five-step sequential evaluation process in considering claims for disability benefits. Regulations require the Commissioner to proceed through the following steps, in order.

> (i) At the first step, . . . consider [the claimant's] work activity, if any. If [claimant is] doing substantial gainful activity, . . . [claimant is] not disabled. . . .

> (ii) At the second step, . . . consider the medical severity of [the claimant's] impairment(s). If [claimant does] not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, . . . [claimant is] not disabled. . . .

> (iii) At the third step, . . . consider . . . [i]f [claimant has] an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, . . . [then claimant is] disabled. . . .

> (iv) At the fourth step, . . . consider [the agency's] assessment of [claimant's] residual functional capacity and [claimant's] past relevant work. If [claimant] can still do [claimant's] past relevant work, . . . [claimant is] not disabled. . . .

> (v) At the fifth and last step, . . . consider [the agency's] assessment of [claimant's] residual functional capacity and . . . age, education, and work experience to see if [claimant] can make an adjustment to other work. If [claimant] can make an adjustment to other work, . . . [claimant is] not disabled. If [claimant] cannot make an adjustment to other work, . . . [claimant is] disabled. . . .

20 C.F.R. § 404.1520(a)(4)(i)-(v).

14. At step two, the ALJ found that Plaintiff's depressive disorder, bipolar disorder, alcohol use/dependence, and arthritis of the big toes and feet were severe impairments. *Id.* at 14-15. At step three, the ALJ found that Plaintiff's impairments were not of listing-level severity. *Id.* at 15-16. At step four, the ALJ found that Plaintiff had the residual functional capacity to perform medium exertional level work, limited to simple, routine, and repetitive tasks, Tr. 16, and, relying on the vocational expert's testimony, concluded that Plaintiff could not perform his past relevant work, *id.* at 20. At step five, again relying on the vocational expert's testimony, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform: cleaner (medium, unskilled, SVP 1), bagger (medium, unskilled SVP 2), and hand packer (medium, SVP 2). *Id.* at 21-22, 55. The ALJ noted the vocational expert's testimony that the cleaner, bagger, and hand packer jobs were not production oriented jobs, i.e. they did not require a high rate of production. *Id.* at 21. Therefore, the ALJ found that Plaintiff was not disabled from November 30, 2009, the alleged onset date, through May 28, 2015, the date of the decision, because Plaintiff was capable of performing other work in the national economy. *Id.* at 22. In the present appeal, Plaintiff challenges the ALJ's RFC determination and its application, at step five, to find Plaintiff capable of performing other work in the national economy.

III. STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial

evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

While the court must examine the record in its entirety for purposes of determining whether the

Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d

772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503

(3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less

than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It

means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*,

186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or

substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182

(3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence

in the record that would justify the opposite conclusion, the Commissioner's decision will be

upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir.

1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the

statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §

423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical

or mental impairment or impairments are of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §

423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)–(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146–47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146–47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146–47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. §

404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined not to be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428.

Fifth and finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146–47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id.*

If the reviewing court finds that the ALJ has erred in the sequential evaluation process, it may modify or reverse the ALJ's decision, with or without remanding the case for rehearing. 42 U.S.C. § 405(g). Reversal with an award of benefits is appropriate only when a fully developed administrative record contains substantial evidence that the claimant is disabled and entitled to benefits. *Podedworny*, 745 F.2d at 221-222; *Morales v. Apfel*, 225 F.3d 310,320 (3d Cir. 2000).

Remand is proper if the record is incomplete, if there is a lack of substantial evidence to support a definitive finding on one or more steps of sequential evaluation process, or if the ALJ's decision lacks adequate reasoning in support of its conclusions to permit for meaningful review by the district court. *See Podedworny*, 745 F.2d at 221-22; *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000). *See also Adorno v. Shalala*, 40 F.3d 43,48 (3d Cir. 1994) (remand appropriate where the ALJ's findings are not the product of a review which "explicitly weigh[s] all relevant, probative and available evidence" in the record (internal quotation marks omitted)).

## IV. ANALYSIS

In the present appeal, Plaintiff contends that substantial evidence in the administrative record supports a finding of disability and asks the Court to reverse the decision of the Commissioner and award Plaintiff benefits, and, in the alternative, argues that the Commissioner's decision is not based on substantial evidence in the administrative record and asks the Court to remand Plaintiff's claims to the Commissioner for reconsideration. Plaintiff raises three specific challenges to the ALJ's decision setting forth the Commissioner's findings. First, Plaintiff argues that the medical evidence in the record does not support the ALJ's finding at step five of the sequential evaluation process that Plaintiff possessed the physical RFC to perform medium work, and instead supports a finding that Plaintiff is capable of no more than sedentary work.[2] Second, Plaintiff argues that the medical evidence does not support and

_____

[2] The parties do not appear to dispute that if the medical evidence were found to support a physical RFC of only sedentary work, Plaintiff would be disabled as of his onset date, which took place after his 50th birthday, 20 CFR Appendix 2, Table 1, Rule 201.14, and that if the medical evidence were found to support a physical RFC of only light work, Plaintiff would be disabled as of his 55th birthday, June 4, 2014, *id.* at Rule 202.06. As Plaintiff argues that an error in the physical RFC alone would be sufficient to require a finding of disability at either the onset date or Plaintiff's 55th birthday, the Court must address both the physical and mental RFC

actively contradicts the ALJ's finding at step five that Plaintiff possessed the mental RFC to perform simple, routine, and repetitive tasks within the tolerances set forth in the testimony of the vocational expert. Third and finally, Plaintiff argues that even if the Court were not to agree that substantial evidence in the record supports a finding of disability, Plaintiff's case should nevertheless be remanded for further proceedings before the ALJ because the ALJ's physical and mental RFC determinations are not set forth with the requisite level of clarity and specificity required by well-established Third Circuit precedent.

1. Physical RFC

The Court first turns to Plaintiff's challenge to the ALJ's physical RFC determination. In his decision, the ALJ found Plaintiff to possess the residual functional capacity to perform medium work as defined in 20 CFR § 404.1567(c). Tr. 16. § 404.1567(c) states that "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." The Social Security Administration's program policy statement, further explains that:

> A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.

> The considerable lifting required for the full range of medium work usually requires frequent bending-stooping (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) However, there are a relatively few occupations in the national economy which require exertion in terms of

---

determinations, even though, as explained below, the Court finds that remand is required for further elaboration of the ALJ's reasons for his mental RFC determination.

weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semiskilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

SSR 83-10.

Although it is not entirely clear from Plaintiff's briefing, which devotes just over a page to the discussion of Plaintiff's physical impairments, Plaintiff's argument that substantial evidence in the record either supports a finding of disability, or, in the alternative does not support the ALJ's RFC determination that Plaintiff is capable of performing medium work, appears to proceed in two parts. Firstly, Plaintiff argues that because the ALJ determined that the arthritis in the big toes of both of Plaintiff's feet was a "severe impairment" within the meaning of 20 CFR § 404.1520(c), "it must result in RFC limitations consonant with the severe impairment." P. Br. 21. Plaintiff appears to argue, without citation to any law, that in the absence of any RFC limitations specifically relating to the severe impairment of arthritis of the toes, reversal or remand is required. Secondly, Plaintiff makes the more general argument that the medical evidence does not support the physical RFC finding, namely evidence of Plaintiff's (i) age of over 50 years old at the time of onset; (ii) hip replacement in 2001; (iii) arthritis in the big toes of both feet; and (iv) inability to squat, Tr. 291.

This Court finds no legal support for Plaintiff's threshold argument that the ALJ's finding of a severe impairment of arthritis of the toes required some specific limitation in the RFC determination referencing or tailored to that severe impairment over and above the medium work exertional limitation itself. To the contrary, while a claimant must have a severe impairment to be found disabled, 20 C.F.R. § 404.1520(c), the regulations only mandate a disability finding when the impairment meets or equals a listed impairment in 20 CFR Part 404 Subpart P,

Appendix 1. 20 C.F.R. § 404.1520(d). Here, the ALJ found that the severe impairment of arthritis of the toes did not meet or equal any of the impairments listed in the Impairment List, and Plaintiff has not challenged that determination. Tr. 15. Accordingly, the relevant question before the ALJ was no longer whether Plaintiff's impairment of arthritic toes was "severe," but rather the effect of that impairment on Plaintiff's residual functional capacity "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). After purporting to consider such evidence, the ALJ determined Plaintiff to be capable of medium work. Tr. 20. Nothing in the regulations suggests, as Plaintiff appears to argue, that a finding of a severe physical impairment necessarily precludes a medium work RFC finding.

Proceeding to the merits of Plaintiff's challenge to the evidence supporting the medium work RFC finding, this Court finds that the ALJ's determination is supported by substantial evidence in the record. In his September 17, 2012 General Medical Report, Plaintiff's treating physician, Dr. Peter T. Orlic, M.D., who saw Plaintiff two to three times per year beginning in August 2002, stated that Plaintiff was in good physical health, Tr. 245, and had no physical limitations, Tr. 250.[3] Dr. Orlic specifically opined that Plaintiff experienced no limitations on his ability to lift, carry, stand, walk, sit, push, or pull. *Id.* at 246. This diagnosis of *no physical limitations* is certainly consistent with and supportive of the ALJ's finding that Plaintiff is capable of medium work, which, as an RFC determination, *does impose physical limitations* on employment, including standing and walking (off and on, for a total of 6 hours in an 8-hour workday), and lifting or carrying objects (with frequency, only weighing 25 pounds or less). The ALJ explicitly noted as much in his opinion, observing that Dr. Orlic provided that "claimant has

---

[3] Dr. Orlic's physical findings contrasted with his notation that Plaintiff suffered from other conditions limiting his ability to work, namely rapid cycling bi-polar disorder. Tr. 245-46.

no exertional limitations," but nevertheless finding that Plaintiff's claimed arthritis "reduces him to the medium level of exertion." Tr. 19.

The evaluation of Plaintiff's treating physician is corroborated in the record by the January 23, 2013 consultative examination of Dr. Justin Fernando, M.D. Dr. Fernando reported that Plaintiff had a normal gait, could heel and toe walk with no difficulty or pain, and had normal station, grip, and pinch strength. *Id.* at 288.  Plaintiff also had normal upper extremity range of motion, joints, and reflexes, and normal range of motion of the cervical and lumbar spines. *Id.* at 288, 289.  Plaintiff exhibited no signs of muscle weakness on his right or left sides, and had no sensory or reflex loss, registering as normal across those categories. *Id.* at 291. Moreover, Plaintiff's straight leg raising test while supine was positive, showing 30 degrees right and 45 degrees left and sitting upright 90 degrees bilaterally. *Id.* at 288, 291.

Dr. Fernando noted Plaintiff's 2001 right hip replacement, *Id.* at 287, but observed that Plaintiff had normal range of motion at the hips, knees, and ankles, Tr. 288, and that there was no evidence of any disuse atrophy on the right side where Plaintiff had the hip replacement, *id.* at 289. A report attached to Dr. Fernando's evaluation also indicates that an x-ray of Plaintiff's right hip conducted on January 16, 2013, revealed the right hip to be properly aligned, with a normal range of motion. *Id.* at 292. In his evaluation, Dr. Fernando also noted that Plaintiff purported to have arthritis in his toes, but recorded that Plaintiff admitted that he had not seen "a podiatrist or anyone for that matter" about the alleged condition. *Id.* at 287. Dr. Fernando also observed that Plaintiff could walk on his toes without difficulty or pain in doing so. *Id.* at 289. Dr. Fernando thus concluded that "if Plaintiff has arthritis in the big toes, it [i]s probably mild," and found that "[p]hysically, the examination could be considered, very close to a normal exam." *Id.* at 289. Finally, Dr. Fernando's evaluation does reflect, as Plaintiff argues on appeal, that

Plaintiff was not able to squat. *Id.* at 291. The ALJ afforded "great weight" to Dr. Fernando's opinions as consistent with the overall record and supporting a medium exertional level RFC. *Id.* at 19.

On appeal, the Commissioner also directs the Court's attention to the treatment notes of Plaintiff's treating psychiatrist Dr. Hriso, which indicate that, in April 2012, Plaintiff reported being busy painting the house which he and his wife were renting. *Id.* at 282. Plaintiff's self-reported ability to paint a house is consistent with the evaluations of the treating and consultative physicians.

Lastly, the testimonial record also supports the ALJ's physical RFC determination. At the March 24, 2015 hearing, Plaintiff testified that he had not sought treatment for his big toes during the years in which he claimed to suffer from arthritis until shortly before the hearing. *Id.* at 51. Plaintiff testified that two weeks prior to the hearing, he had received cortisone injections from a podiatrist. *Ibid.* Plaintiff reported that his toes were feeling better as a result of the treatment, but that it was his understanding that the treatment's effect would only be temporary. *Ibid.* Plaintiff did, however, testify that his arthritic feet made it uncomfortable for him to stand and walk for more than "[b]etween a half-hour and an hour." *Id.* at 52. Plaintiff also unequivocally stated of his replaced hip that his "[h]ip is working fine." *Id.* at 50.

In his opinion, the ALJ noted Plaintiff's claim to continuing toe pain and limitations on physical mobility, but found Plaintiff's statements "concerning the intensity, persistence and limiting effects" of these symptoms "not entirely credible[,]" Tr. 17, because the pain was present for a period of years and yet did not interfere with Plaintiff's activities of daily living, frequent home relocation, or long-distance travel, or motivate Plaintiff to seek treatment until shortly before the hearing. *Id.* at 19-20. Credibility determinations are entitled to substantial

deference on appeal. *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003) (stating that courts "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor."); *see also Izzo v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 280, 286 (3d Cir. 2006) (finding that "a reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness."). The Court finds no basis to overturn the ALJ's determination, given the substantial evidence, including the consensus of the medical evidence cited in the opinion, contradicting Plaintiff's testimony of limitations in walking and standing.

Accordingly, reviewing the evidence in the record, this Court finds that substantial evidence supports the ALJ's physical RFC determination that Plaintiff was capable of medium work.[4] While the objective medical evidence provided no basis for arthritis in Plaintiff's toes imposing any limitations on physical exertion, the ALJ, in a decision favorable to Plaintiff, nevertheless found that it imposed some limitation and restricted Plaintiff to medium work. Plaintiff's additional allegedly contradictory evidence on appeal of Plaintiff's age, hip replacement, and inability to squat are not persuasive. Age exceeding 50 years alone is not sufficient to establish inability to adjust to other work. 20 C.F.R. § 404.1563 ("We will not consider your ability to adjust to other work on the basis of your age alone."). Plaintiff himself testified that his hip imposed no limitations upon him, which testimony was supported by the report of Dr. Fernando. And Plaintiff has identified no authority that inability to squat alone is

---

[4] In so finding, the Court also finds that the ALJ has provided adequate reasoning in support of his conclusions to permit meaningful review by this court. *Burnett*, 220 F.3d at 119-20. The ALJ did not merely summarize the findings of Drs. Orlic and Fernando and the testimony of the Plaintiff, but rather clearly indicated the weight afforded to key pieces of evidence supporting and potentially contradicting the ALJ's physical RFC determination and the reasons for crediting or discounting such evidence.

disqualifying from medium work. *Compare* 20 CFR Part 404 Subpart P, Appendix 1, Part A, Subpart 1.00(E) (discussing inability to squat as relevant to identification of certain impairments) *with* SSR 83-10 (discussing limitations on stooping, bending, and crouching, but omitting any reference to squatting as relevant to medium work).

2. Mental RFC

As noted above, Plaintiff's challenge on appeal to the ALJ's mental RFC determination proceeds in two parts. Plaintiff first argues that the consensus of the medical evidence contradicts the ALJ's mental RFC determination that Plaintiff could sustain simple, routine, and repetitive tasks, 8 hours per day, 40 hours per week, within the tolerances outlined by the Commissioner's vocational expert. Specifically, in his opinion, the ALJ found that Plaintiff possessed the mental RFC to perform medium work limited to simple, routine, and repetitive tasks. Tr. 16. At the hearing, the vocational expert testified that a person performing such jobs could not maintain employment if he or she were absent more than once a month or performed less efficiently than "the average rate of the workers." *Id.* at 56-58.[5] This testimony is not included in the ALJ's opinion. Plaintiff argues that, based on these parameters set forth by the vocational expert, Plaintiff's "rapid-cycling bipolar disorder" with "moderate to severe chronic mental illness" along with his "poor concentration" and "significant short term memory problems," as evidenced in the medical record, would prevent Plaintiff from maintaining the employment identified by the vocational expert. Plaintiff relies upon evidence in the administrative record from Plaintiff's

---

[5] Plaintiff contends that the vocational expert also testified that a person of Plaintiff's age and education could not maintain the identified medium work jobs where he or she is more than 5% off-task (3 minutes per hour). Reviewing the transcript of the vocational expert's testimony, however, it is clear that the vocational expert testified that in the medium work jobs identified for a hypothetical individual comparable to Plaintiff, a person could maintain employment while up to 15% off-task, Tr. 56, and that the more-restrictive 5-7% off-task figure was restricted to production oriented jobs, *id.* at 57, which did not include the identified jobs, *id.* at 58.

treating doctors Chavkin and Hriso, the government psychiatric examiner, Dr. Khoshnu, and the DDS psychologists, which Plaintiff contends was either overlooked or unfairly discredited in the ALJ's opinion.

Second, in the alternative, Plaintiff argues that, at minimum, the ALJ's opinion does not comport with the requirements of the Third Circuit's decision in *Cotter*, requiring that ALJs articulate their reasons for reaching RFC determinations, particularly the crediting and discrediting of medical evidence, with sufficient clarity and specificity. *Cotter*, 642 F.2d at 705 ("we need from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."). Plaintiff contends that although the ALJ took note of the opinions of Plaintiff's treating physicians that his rapid-cycling bipolar disorder prevented him from working, he discounted those opinions without properly identifying the contradictory medical evidence upon which he relied. Plaintiff argues that this failing particularly stymies review because the ALJ also discounted or omitted the diagnoses of the government's own experts — the state agency DDS psychologists and Dr. Khoshnu — which could be read as consistent with those of Plaintiff's treating physicians. The Commissioner opposes both arguments and attempts to identify record evidence cited by the ALJ in support of his mental RFC determination and instances in the opinion of the ALJ articulating his reasoning. The Court finds that Plaintiff prevails on his second argument that the insufficiency of the ALJ's reasoning prevents meaningful appellate review by this Court of the substantiality of the evidence in support of the ALJ's mental RFC determination, and, therefore, the Court does not proceed to Plaintiff's first argument concerning the evidence.

The ALJ is responsible for making the ultimate determination of an individual's RFC. 20 C.F.R. § 404.1546; *see Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."). "[I]n making a residual functional capacity determination, the ALJ must consider all evidence before him," and, although the ALJ may weigh the credibility of the evidence, he must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121; *see also Fargnoli v. Halter*, 247 F.3d 34, 43 (3d. Cir. 2001) (an ALJ is required to provide "an explanation of the reasoning behind [his] conclusions," including "reason(s) for discounting rejected evidence."); *Cotter*, 642 F.2d at 704. "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. For example, in *Burnett*, the Third Circuit determined that remand was warranted, because the ALJ "fail[ed] to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." 220 F.3d at 121. However, "[w]here the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3rd Cir. 2012) (internal quotation marks and citation omitted).

Moreover, under 20 C.F.R. § 404.1527(c)(2), a treating source's opinion will be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Several factors may also be used to determine the weight given to a medical opinion including: the length of the treatment relationship; the nature and extent of the treatment

relationship; supportability by the medical evidence; and consistency with the record as a whole. *Id.* at § 404.1527(c)(2)(i)-(ii). If a treating source's opinion conflicts with that of a non-treating source, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons." *Morales*, 225 F.3d at 317. That is, the ALJ must rely only on "contradictory medical evidence" in rejecting the treating source's opinion, rather than "credibility judgments, speculation or lay opinion." *Id.* Thus, an administrative law judge may not disregard an otherwise credible medical opinion based solely on the ALJ's own "amorphous impressions." *Id.* at 318. *See also Yensick v Barnhart,* 245 F. App'x 176, 181 (3d Cir. 2007) ("An ALJ 'is not free to employ his/her own expertise against that of a physician who presents competent medical evidence.'" (quoting *Plummer,* 186 F. 3d at 429)).

Here, there is no dispute that Plaintiff's treating physicians opined on significant limitations on Plaintiff's work-related activity due to his severe mental impairments.[6] In his opinion, the ALJ acknowledged Dr. Chavkin's evaluation that Plaintiff had "poor to no ability to make occupational, performance or social adjustments," and exhibited "poor concentration and memory with low energy" as a result of his rapid-cycling bipolar disorder. Tr. 19. The ALJ also took note of Dr. Hriso's "similar statement" concluding that Plaintiff "has fair to poor or no

---

[6] Plaintiff presents the following evidence from the treating physicians as contradicting the ALJ's finding below: Dr. Chavkin's August 3, 2014 assessment of Plaintiff has having "poor concentration" and "significant short term memory problems," coupled with "poor or no[]" ability to deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, maintain concentration, understand and carry out complex or simple job instructions, behave in an emotionally stable manner, or demonstrate reliability, Tr. 307-309; and Dr. Hriso's August 5, 2014 assessment of Plaintiff has having "poor or no[]" ability to follow work rules, interact with supervisors, deal with work stress, maintain concentration, and understand and carry out complex or detailed job instructions, Tr. 310-319. Plaintiff contends that, coupled with the testimony of the vocational expert that the identified jobs required concentration and averagely efficient performance, this evidence demonstrates that Plaintiff did not retain the residual mental functional capacity to work.

ability to make occupational adjustments, fair ability to make social adjustments, but fair to poor or no ability to make performance adjustments . . . [and] some difficulty with short-term memory and concentration" as a result of Plaintiff's bipolar disorder. *Id.* at 19. Both treating physicians concluded that Plaintiff's bi-polar condition was associated with numerous limitations on Plaintiff's ability to work. *Id.* at 307-209 (Dr. Chavkin); *id.* at 311-318 (Dr. Hriso). Under well-established, Third Circuit precedent therefore, the ALJ was required to identify the contradictory medical evidence upon which he relied to negate or discount the opinions of the treating physicians. *See Morales*, 225 F.3d at 317.

The ALJ purported to contradict the treating physicians with the government's experts — the DDS psychologists and Dr. Khoshnu. The distinguishing factor of the case at bar, however, from the mine-run appeal, is that significant portions of the government expert opinions could be read as consistent with the treating physicians' diagnoses. The ALJ, however, either omits or inadequately distinguishes these portions in the opinions. First, the ALJ gave some weight to the DDS opinion that Plaintiff retained the residual functional capacity for medium level exertional work, could understand, remember, and follow short and simple instructions, and could perform simple, routine tasks. Tr. 20. The ALJ, however, gave no weight to the DDS opinion that Plaintiff suffered from moderate to marked limitations on his social interactions — opinions consistent with the evaluation of Plaintiff's treating physicians concerning Plaintiff's inability to make the requisite social adjustments to new work. *Ibid.* 20. The ALJ explained that he discounted this medical evidence on the basis of Plaintiff's own testimony at the March hearing, specifically, that Plaintiff attends social events with his brother-in-law, interacts with his wife and daughter without difficulty, worked on a high frequency trading project with others after his onset date, and was able to work at the same employer for a period after an incident with a

coworker. *Ibid.* The ALJ failed, however, to identify what contradictory *medical* evidence he relied upon in discrediting the opinion of the DDS psychologists. *See Morales*, 225 F.3d at 317.

Second, the ALJ, in his concluding RFC analysis, relied upon the findings of Dr. Khoshnu's consultative examination to support his conclusion that the medical record as a whole suggested "no more than mild limitations on social functioning" and "no more than marked psychiatric impairments." Tr. 20. The ALJ described those findings as that Plaintiff "was alert and oriented with good mood . . . exhibited good memory, good immediate recall and a fund of knowledge," and supporting "no more than moderate limitations in concentration, persistence and pace as well as a mild limitation for social interactions." *Id.* at 17. There are certainly opinions and observations in Dr. Khoshnu's report that are consistent with the ALJ's characterization,[7] but there are also several major omissions which call into question whether the ALJ truly intended Dr. Khoshnu's report to contradict the diagnoses of Plaintiff's treating physicians. Specifically, Dr. Khoshnu's Axis I and Axis IV diagnoses of Plaintiff were substantially the same as those of Plaintiff's treating physicians, namely rapid cycling bipolar disorder and mood worsening, coupled with moderate-to-severe mental illness and poor management of medication. *Id.* at 306. Additionally, Dr. Khoshnu observed that Plaintiff was unable to accurately count backward by sevens from 100, and was able to recall none of three test words after the passage of two to three minutes. *Id.* at 306. While the ALJ is not required to recite every potentially contradictory piece of medical evidence in making an RFC determination, given the centrality of the consultative examination to the refutation of Plaintiff's treating physicians, more explanation is required than the ALJ's paraphrases of Dr. Khoshnu's

_____

[7] *See* Tr. 306 (reporting Plaintiff's ability to follow conversation, spell a word forward and backward, recall the names of the recent presidents, answer basic hypothetical questions).

opinions on Plaintiff's "good memory" "mild" limitations on social functioning and "no more than marked" psychiatric impairments. *Id.* at 20. On the basis of the present opinion, this Court is unable to evaluate the ALJ's reasons for so characterizing Dr. Khoshnu's diagnosis of rapid cycling bipolar disorder and moderate-to-severe mental illness; they are simply not provided.

Finally, in his narrative summary of the medical evidence, the ALJ also recounted evidence provided by the treating physicians which could be read as consistent with the ALJ's RFC determination. In the analysis following the narrative, however, the ALJ does not directly analyze how this potentially supporting evidence interacts with or negates the treating physicians' opinions on disability. With respect to Dr. Hriso, the ALJ explicitly considered the Dr.'s notes that Plaintiff experienced post-onset periods during which Plaintiff did well on medication and exhibited stable mood from 2010 through 2011, during which time Plaintiff successfully traveled to Florida to visit his parents and to Denver to visit his daughter and her fiancé. Tr. 17. The ALJ also wrote about Dr. Hriso's notes concerning Plaintiff's abuse of alcohol and mixing alcohol with medication during the 2011-2012 period. *Id.* at 18. Finally, the ALJ stated that he considered Dr. Hriso's findings that in 2014, Plaintiff was generally pleasant, showing good response to medication, was not manic, had fair ability to make social adjustments, and was capable of managing his own benefits. *Id.* at 19. With respect to Dr. Chavkin, the ALJ explicitly considered in his opinion the Dr.'s August 21, 2012 statement that the Plaintiff exhibited depressed mood, but also normal appearance and behavior, good judgment and intellect, and compliance with his medication. *Id.* at 18. The ALJ noted Dr. Chavkin's finding in the same statement that Plaintiff had not suffered a decompensation episode since fall 2011 and did not have limits in activities of daily living. The ALJ also considered Dr. Chavkin's July 16, 2013 statement that Plaintiff was generally pleasant and cooperative, with a generally

good attitude, was responding well to medication, and had no manic states. The ALJ noted that Dr. Chavkin also concluded that Plaintiff exhibited reduced concentration and extremely poor memory, but observed that Plaintiff cares for himself, goes grocery shopping, prepares meals, and has good hygiene and grooming. *Id.* at 18. Finally, the ALJ noted that Dr. Chavkin's August 3, 2014 report concluded that Plaintiff could manage his own benefits with his wife's assistance.

Of all the forgoing information, in his concluding RFC analysis, the ALJ states only that "as noted in the treating source medical source statements, no more than mild limitations in social functioning are evident. Treatment notes show the claimant is consistently cooperative." *Id.* at 20. The ALJ does not explain whether he intended his evaluation of the treatment notes to discredit or discount the medical opinions of the treating physicians who recorded the notes and drew from them the conflicting opinion that Plaintiff was more than "mildly" limited in social function. *Ibid.* If the ALJ intended to use Dr. Chavkin's and Dr. Hriso's own notes to undercut their diagnoses, the ALJ was required to do so explicitly, not by implication. *Burnett*, 220 F.3d at 121.

In sum, where, as here, the ALJ has "failed to mention or refute some of the contradictory medical evidence before him" critical to the evaluation of Plaintiff's RFC and necessary to the discounting of the Plaintiff's treating physicians, the ALJ has erred, and the appropriate remedy is remand, on which "the ALJ must review all of the pertinent medical evidence, explaining his conciliations and rejections." *Burnett*, 220 F.3d at 121-122. This case will therefore be remanded to the Commissioner for reconsideration of Plaintiff's mental RFC consistent with this Opinion.[8]

---

[8] It is important to note that, in issuing this decision, the Court makes no comment on the sufficiency of the evidence either supporting or not supporting the ALJ's mental RFC determination; rather, remand is called for in this matter precisely because the absence of specific statements in the ALJ's opinion identifying which medical evidence is being employed to contradict or outweigh the opinions of Plaintiff's treating physicians prevents this Court from

## IV. CONCLUSION

For the foregoing reasons the Court affirms the Commissioner's determination of Plaintiff's physical RFC and remands this case for reconsideration of Plaintiff's mental RFC. An appropriate order to follow.

Dated:      11/27/2017                          /s/ Freda L. Wolfson
                                        The Honorable Freda L. Wolfson
                                        United States District Judge

---

engaging in meaningful appellate review. As the Third Circuit has long explained, "[t]here are cogent reasons why an administrative decision should be accompanied by a clear and satisfactory explication of the basis on which it rests. Chief among them is the need for the appellate court to perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704–05.

> Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, . . . an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper. A statement of reasons or findings also helps to avoid judicial usurpation of administrative functions, assures more careful administrative consideration, and helps the parties plan their cases for judicial review.

*Id.* at 706–07. In the special circumstance of rejecting the assessment of a treating physician, the reasons given must be "'on the basis of contradictory medical evidence.'" *Morales*, 225 F.3d at 317 (quoting *Plummer*, 186 F.3d at 429). Such evidence may certainly be present in the existing record, but has not yet been presented for the benefit of the Plaintiff and of this Court as it factored into the ALJ's reasoning. On remand, therefore, the outcome of Plaintiff's claim for disability benefits very well may not change, but Plaintiff is nevertheless entitled to a clear statement of reasons to better assess whether he will seek judicial review.